**Jonathan COBB, Darryl Cobb, and Annette Cobb, Plaintiffs,**

v.

**THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, et al., Defendants.**

**No. CIV.A. 99–0007–C.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

July 7, 1999.

Jonathan Cobb, Darryl Cobb, Annette Cobb, pro se.

Mark K. Earky, Attorney General of Virginia, Ashley L. Taylor, Jr., Deputy Attorney General, Ronald C. Forehand, Senior Assistant Attorney General, William E. Thro, Assistant Attorney General, for Defendants.

## MEMORANDUM OPINION

MOON, District Judge.

Defendants[1] filed two separate motions to dismiss pursuant to Fed.R.Civ.P.

1. The following named defendants joined one or both of the motions to dismiss: The Rector and Visitors of the University of Virginia, the Honor Committee of the University of Virginia, the Commonwealth of Virginia, James S. Gilmore, III, Wilbert Bryant, John Ackerly, III, Franklin Birckhead, Charles Caravati, Champ Clark, William Crutchfield, Hovey Dabney, William Godwin, T. Keister Greer, Elsie Goodwyn Holland, C. Wilson McNeely, III, Timothy Robertson, Terrence Ross, Albert Small, Elizabeth Twohy, Henry Valentine, III, Walter Walker, Benjamin Warthen, James Wheat, III, Joseph Wolfe, Alexander Gilliam, Jr., John Casteen, William Harmon, Robert Canevari, Stephen Plog, Paul Forch, Richard Kast, Ronald Michener, Elizabeth Bibb, Edmond Cox, Nicole Eramo, April Fernley, Weston Fox, Kristine LaLonde.

12(b)(6), one in the named defendants' official capacities and one in their personal capacities. Both motions allege that the complaint fails to state a claim upon which relief can be granted. Because plaintiffs have filed with their complaint extensive documentation surrounding their claims, the Court is able to make conclusions concerning the case which normally might be made pursuant to a Rule 56 summary judgment motion. After reviewing the motions and hearing oral argument, the defendants' motion is granted in part and denied in part. The Court also dismisses *sua sponte* some of the remaining defendants who are unrepresented by counsel.

Plaintiffs' complaint includes the following claims: (1) Breach of Fiduciary Duty; (2) Breach of Contract; (3) Violation of Human Rights; (4) Denial of Equal Protection of the Laws; (5) Denial of Substantive Due Process of Property Rights; (6) Denial of Procedural Due Process; (7) Intentional Infliction of Emotional Distress; and (8) Defamation.

## I. FACTS

Plaintiff Jonathan Cobb ("Cobb"), an African–American and former student of the University of Virginia ("University"), was discharged from the University in the Fall semester of 1997 for cheating on an Economics 371 examination given on March 5, 1997. Cobb was found guilty of cheating by a randomly selected student jury pursuant to the University's Honor System on December 6, 1997. After Cobb's honor conviction, the Honor Committee's appeals panel upheld the jury's guilty verdict. Cobb exhausted his final avenue of relief under the Honor System when his request for a Grievance Panel was denied. The Honor System is governed by the Honor Committee By–Laws ("By–Laws"). The Honor Committee itself is comprised of University students who are elected by their peers. The Honor Committee is charged with enforcing the University's Honor System after an alleged honor violation is reported.

The honor investigation of Cobb began when Ronald Michener, the professor of the economics class, filed an honor violation with the Honor Committee four days after the exam. A photocopy of Cobb's exam was returned to him on March 17, 1997, with the words "pending investigation" written on it. Cobb, along with another African–American student with a similarly marked exam,[2] went to Michener's office where they were told that they were suspected of cheating. They were also instructed to contact the Honor Committee concerning their case. That same day, they went to the Honor Committee's office and were advised that they would be contacted by an Honor Committee advisor[3] to assist them with defending their case.

Despite the Honor Committee's assurances, no one contacted Cobb for the remainder of the semester nor the following summer. Cobb proceeded to register for classes for the Fall 1997 semester and paid approximately $8,000 in tuition and fees. In late September or early October, Cobb was notified by defendant Erika Werner that she had been assigned as his advisor by the Honor Committee. The Honor Committee investigated Cobb's case from September 26, 1997 to October 7, 1997. After the investigation, the Honor Committee decided to charge Cobb with cheating.

The facts surrounding the economics examination are as follows. Professor Michener initially suspected another student of cheating on a previous exam.[4] In response, Michener devised two versions of

---

**2.** The plaintiffs' complaint states that the other student's case was ultimately dismissed.

**3.** Honor advisors are assigned to students in order to "(a) provide students going through the system, including initiators, with emotional and confidential support; and (b) to provide the parties to which they are assigned with neutral and impartial information about the process they will be experiencing." By–Laws at 3.

**4.** No charges were brought against the original suspected student.

the March 5th exam with only slight deviations in the questions.[5] The exam consisted of three questions. Question 1 contained two subsections: (a) and (b). Questions 2 and 3 each contained three subsections: (a), (b), and (c). Cobb wrote down a response for Questions 1(a), 2(a), (b), and (c), and 3(a). These questions are listed below:

1) A woman buys a carton of eight eggs at the store, brings it home, and hard boils five of them for egg salad sandwiches. She separates the raw eggs from the cooked ones in the refrigerator, but her spouse unknowingly rearranges the refrigerator, mixing them together.
 a) The next morning she needs two hard boiled eggs for sandwiches. What is the probability she will find two that are hard boiled without having to break more than 3 eggs?

2) The number of minutes it takes to grade a midterm exam is a random variable with the following distribution (in minutes):

| x | f(x) |
|----|------|
| 5 | .50 |
| 10 | .25 |
| 15 | .20 |
| 20 | .05 |

 a) What is the mean and variance of the time it takes to grade an exam?
 b) If there are 42 students who took the exam, what is the probability the total grading time will exceed six hours?
 c) Tests that take 15 minutes or more to grade are considered "hard to grade." What is the chance that 12 or more of the 49 exams will be "hard to grade."? {Hint: for full credit, use continuity correction}

3) An architect wishes to design doors so that 95 percent of all people have at least a 1 inch clearance when passing through.
 a) If people have a mean height of 66 inches and a standard deviation of 4 inches, how high must the doors be? (Assume that people's heights are a normally distributed random variable.)

Question 1(a) of the other exam was identical to Cobb's exam except the women in the other exam boiled four out of the eight eggs instead of the five eggs in Cobb's exam. In filling out the equation needed to compute the answer, Cobb used the number four instead of the number five as was required on the test he was given. At the honor trial, Michener testified that

So, $\times = 2$ is the number of successes in this case, the number of hard boiled eggs, and then $r = 4$, that number corresponds to the number of successes that exist in the population, and in that case, that's the number of hard boiled eggs there are in the refrigerator and if you look at Jonathan's test, the correct number for $r$ is 5. If you look at the other version of the test, you'll see the correct version for $r$ is 4.

\* \* \* \* \* \*

... the numbers on his paper correspond with the calculation for exactly 2 hard boiled eggs as if it appeared on the other test. Now the calculation happens to be carried out correctly for that piece, 2456 which is, as you'll note on Jonathan's text, is sort of what he ends up with, so there's a manipulation of the formula to determine the number for that term is correct. Let me just draw your attention to the fact that the mistake here is a mistaken [sic] in terms of writing down the givens of the problem.

**5.** Michener numbered the tests and stacked them so that the two versions of tests alternated. He then instructed his teaching assistant to hand out a stack of tests to each row of students. The scheme was designed so that students sitting next to each other would have a different test. However, Michener admitted during the honor trial that he did not know in fact whether the students sitting around Cobb had a different version of the test than Cobb. Moreover, he testified that he "found nothing ... that bore either on [Cobb's] innocence or his guilt in any of the consecutively numbered tests." Trial Testimony at 14.

In other words, this is a word problem and you have to go through the word problem. You have to figure out what N is, what n is, what × is and what r is, and the givens are just written down. Generally people write down sort of what's given in the test and then they start manipulation. I don't [know] how you'd would [sic] get the wrong givens in anyway [sic] than what's on the other person's test.

Trial Testimony at 3.

Cobb's answer to question 2(b) is complicated by a drafting error in question 2(c) of Cobb's test. Michener inadvertently used the number 49 in question 2(c) of Cobb's test instead of the number 42 which was set forth in question 2(b). Michener testified that when he changed the numbers to create the two versions, he only altered question 2(b) and neglected to make a corresponding change to question 2(c). In answering question 2(b), Cobb used the number 49 which, Michener conceded at trial, could have originated from question 2(c) and not from the other test.

Question 3(a) of the other test used a mean height of 67 inches with a standard deviation of 3 inches instead of the corresponding 66 and 4 inches in Cobb's test. At the honor trial, Michener testified that the

> givens of the problem [in Cobb's test] are if people have a mean height of 66 inches and a standard deviation of 4 inches, now a very basic matter of notation and something that I think every student in the class almost certainly understood ... is that mu was sort of the universal notation for mean and sigma is the universal notation for the standard deviation. What Jonathan has written immediately to the left of 3A is mu equal 67 and sigma equals 3. Now, if you look at the other test, it is true on the other test that mu equal 67 and sigma equals 3, but 66 and 4 are the numbers [on Cobb's test].

*See* Trial Testimony at 3.

At his honor trial, Cobb tried to explain how he innocently generated the incorrect numbers. Regarding the question 1(a), where he used four eggs instead of five eggs, he testified that he believed that in order to correctly calculate the answer he needed to use a formula containing n–1 as the variable representing the number of successful attempts (*i.e.* hard boiled eggs). Trial Testimony at 20. Applying n–1 to the numbers contained in question 1(a), Cobb testified that he took the five hard boiled eggs, subtracted one from that number and obtained the number four. *Id.*

For question 2(b), Cobb offered the following testimony:

> When I got down to Part B, I was quite confused on this part, so I started doing part B and what I can recall, I looked on my equation and I saw for 6.3, I saw the z equation, but I wasn't sure which numbers to use so I started on Part C and for that equation I first thought of using equation 6.2. Yes, 6.2. Then, again, on Part C, I really didn't know what I was doing, so I just did quit that and I went back to Part B and as far as the z equation, instead of using the 42 students who took the exam, I took the 49—at this point, I was basically just trying to punch numbers in my calculation. I wasn't sure which equation to use. I knew which equation to use was the equation, but I wasn't sure which numbers to plug into the equation. I ended up using 49 as my sigma.

*Id.*

As to question 3(a), where Cobb used 66 and 3 inches instead of 67 and 4 inches, respectively, Cobb explained that

> [W]hen I read at least 1 inch, I thought maybe that clued into me that maybe I should do something with that 1 inch. I took the 1 inch into account within the problem so for the mean, I took the inch and I added that to the 67, to the 66, which I wrote off to the left hand side and then for the standard deviation I subtracted 1 which gave me 3 which I wrote off to the left hand side. And as far as adding and subtracting, I wasn't sure if you were supposed to add the 1 inch to the mean or subtract the 1 to,

add or subtract the 1 to the standard deviation. Also, you can see I had the 1.65 = × cube, that is × cubed minus 1 on 67. As Mr. Michener said, it totally doesn't make any sense and after going back and looking through my notes on that chapter, I totally agree with him that I had no clue what I was doing and × cubed minus 1, I don't know where I got that from, cause it wasn't on my equation sheet and I'm not exactly sure where I got that equation from. Obviously, I was just rambling, trying to make equations, trying to get partial credit for something written down even though Mr. Michener wouldn't have given it to me cause it was clearly senseless . . . .

Trial Testimony at 21. The following dialogue occurred in regards to question 3(a):

Juror: "[H]ow come like 67 and 3 were even an option even though like it wasn't anywhere in the equation . . . ?"

Cobb: "I could've easily subtracted 1 from 66 to get 65 or add 1 to 4 and get 5."

Juror: So you did both?

Cobb: No. I'm just saying on that particular time when I was taking the test, I added 1 to 66, subtracted 1 from [4]. But, I mean, if it was another time

maybe I would've added, subtracted 1 from 66. I just wasn't sure if I was supposed to add or subtract which you weren't supposed to do at all . . . .

Trial Testimony at 24.

Michener testified that in his opinion the "strongest and most unambiguous evidence of cheating is in question 1A and 3A, but I think there's some additional evidence in 2B." Trial Testimony at 3. As to a person making all three mistakes, Michener stated that

I would say that any one of these is an honest mistake is highly improbable and that several of them on the same test are just extraordinary improbable. I mean, any one of these, in and of itself, it sort of a once in a decade kind of mistake at most, and to see that many together seems to me to be just hugely unlikely.

Trial Testimony at 13. In finding Cobb guilty of cheating,[6] the jury gave greater weight to the circumstantial evidence and Michener's testimony than to Cobb's explanations as to how he innocently arrived at his answers.

After the jury trial, Cobb requested an Appeal Hearing and one was held on February 18, 1998. The appeal panel upheld Cobb's guilty verdict.[7][8] Cobb attempted

---

6. To render a guilty verdict, the trial panel must determine that the "evidence against the accused student demonstrates, beyond a reasonable doubt: (a) that the accused student committed an act of lying, cheating, and/or stealing; (b) the accused student knew or should have known at the time of the act that his or her action is or could be considered an honor offense; and (c) that the offense was of such a serious nature that open toleration of it would be inconsistent with the ideals of honor currently embraced by the community of trust." By–Laws at 10.

7. The By–Laws provide:
 [1] The dismissed student can appeal on two grounds: (a) an appeal for good cause; and (b) an appeal because of new evidence. For any good cause appeal, the dismissed students must describe the grounds for appeal, state whether they desire a closed or open appeal, and designate their choice of counsel.
 [a] For an appeal on good cause, dismissed students must show:

 (1) that they had not waived their right to appeal, and that they were denied an explicit right in the [Honor Committee] Constitution; or
 (2) that they were denied a "full and fair hearing" or right that is implicit in these by-laws and that the denial of a "full and fair hearing" or implicit right more likely than not affected the outcome of the trial.
 [b] For an appeal because of new evidence, the dismissed student must show that the new evidence would have more likely than not affected the outcome of the trial.
 [2] The appeal panel shall be composed of five Committee members. A grant for a new trial requires a three-fifths vote of the panel.
 By–Laws at 11.

8. On appeal, Cobb contended *inter alia* that the delay in having a trial prejudiced his defense. After a full hearing, the appeals panel held that the "evidence presented . . .

to exercise his last avenue of relief by requesting a Grievance Panel.[9] However, in a letter dated October 2, 1998, the Executive Committee declined to grant Cobb's request:

> After careful review of your file, the Executive Committee decided not to grant a Grievance Panel in regards to the above-captioned matter. The Committee did not make this decision lightly. Each member reviewed the file personally, including the evidence file, trial tapes and interview with the support officers involved. Though there were some irregularities in the adjudication of your case, we feel the proceedings were fundamentally fair and the jury verdict of December 6, 1997 stands.

Complaint Exhibit 21.

## II. MOTION TO DISMISS STANDARD

When considering a motion to dismiss under Rule 12(b)(6), this court must consider all facts and reasonable inferences which may be drawn from the face of the plaintiffs' complaint to determine whether all of the required elements of the cause of action are present. *Oram v. Dalton*, 927 F.Supp. 180, 184 (E.D.Va.1996) (citing *Wolman v. Tose*, 467 F.2d 29, 33 n. 5 (4th Cir.1972)). This means that all factual allegations in the plaintiffs' complaint must be accepted as true, *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 217–18 (4th Cir.1994), and should be construed liberally. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991). The Court

may not dismiss the complaint unless it is apparent that the plaintiffs would not be entitled to relief. *Id.* Dismissal for failure to state a claim is proper where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

## III. DISCUSSION

### A. 11th Amendment Considerations

The plaintiffs allege that the defendants violated their procedural and substantive due process rights as well as their equal protection rights. Because a *pro se* plaintiff's claims should be construed liberally, the Court will assume that the plaintiffs intended to include a 42 U.S.C. § 1983[10] claim in their complaint. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

The Rector and Visitors of the University, the Honor Committee, the Commonwealth of Virginia, and several of the individual defendants sued in their official capacities filed a motion to dismiss all claims against them contending that the plaintiffs' claims are barred by the 11th Amendment. This Court previously established that the Commonwealth and the Rector and Visitors of the University are entitled to absolute immunity under the 11th Amendment. *Collin v. Rector & Bd. of Visitors of Univ. of Va.*, 873 F.Supp. 1008, 1013 (W.D.Va.1995); *Wilson v.*

---

was not sufficient to constitute showing of a good cause appeal ...." Exhibit 19 at 21.

9. In regard to the grievance procedures, the By–Laws provide:

> Purpose: As an avenue of last resort, the honor Committee will allow dismissed students to present concerns regarding the fairness of the proceedings which led to their dismissal.
> ▪ Dismissed students who have exhausted their right to an appeal may submit a letter expressing their grievances, along with any relevant evidence, to the Executive Committee. The Executive Committee may

then present the grievance to the full Committee at their discretion.
> By–Laws at 11.

10. Section 1983 states in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Univ. of Va.,* 663 F.Supp. 1089, 1092 (W.D.Va.1987). However, the Court will assume for the purpose of this motion that the 11th Amendment does not bar the Court from awarding the plaintiffs injunctive relief against the Honor Committee.[11] Although the plaintiffs do not specify in which capacity they are suing the individual defendants, the Court will construe the complaint as a suit against both their official and personal capacities.[12]

■■■ As to the individual defendants' official capacity, the 11th Amendment bars the plaintiffs from bringing an action for monetary relief. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Court will thus dismiss all claims for monetary damages against the defendants sued in their official capacity. In addition to the plaintiffs' demand for a monetary award, the plaintiffs move the Court to abolish the University's Honor System. This is the type of prospective injunctive relief which is permitted under the 11th Amendment. A federal court is empowered to "enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (citing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Therefore, to the extent the individual defendants are sued in their official capacities[13] for prospective injunctive relief, the Court will review the substantive merits of the plaintiffs' claims. Likewise, the 11th Amendment does not prohibit the plaintiffs from suing the individual defendants in their personal capacities, *Hafer v. Melo,* 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), and the Court will review the merits of those claims.

11. This issue has not been briefed by the parties.

12. *See Biggs v. Meadows,* 66 F.3d 56 (4th Cir.1995); *Jacobs v. College of William and Mary,* 495 F.Supp. 183, 189 n. 6 (E.D.Va. 1980)

13. The Supreme Court has held that "a state official in his or her official capacity, when

### B. Breach of Fiduciary Duty

■■■ Plaintiffs allege that the Commonwealth, the Rector and Visitors of the University of Virginia, Governor Gilmore, Casteen, and Michener, in accepting Cobb's application for admission and tuition payments, owed Cobb a duty of good faith, fair dealing, and honesty and subsequently breached those duties. However, the complaint does not provide the source of these purported fiduciary duties and the Court is unable to identify any statutes or case law establishing these duties. Moreover, even if these duties exist, the complaint fails to allege acts by specific defendants which breached one of the duties. Therefore, the Court holds that the plaintiffs' breach of fiduciary duty count fails to state a claim upon which relief can be granted and this count is dismissed.

### C. Breach of Contract

■■■ Plaintiffs' breach of contract claim asserts that (1) the defendants promised the students matriculating at the University that a student could not be permanently dismissed from the University if the student refrained from lying, cheating, or stealing; (2) the defendants promised that the University had placed safeguards within the Honor System which would prevent innocent students from being dismissed from the University; (3) the defendants misrepresented to the plaintiffs the existence of responsible leadership at the University which would protect innocent students from being permanently dismissed without a right to appeal the dismissal to any responsible adult or adult leadership; (4) the defendants misrepresented to the plaintiffs the existence of an atmosphere of trust at the University where only those

sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will,* 491 U.S. at 71, n. 10, 109 S.Ct. 2304 (citing *Kentucky v. Graham,* 473 U.S. 159, 167, n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

students who were guilty of "intentional lying, cheating or stealing of sufficient seriousness to warrant permanent dismissal from the University" would be dismissed by the University for an honor violation; (5) the defendants breached their promise that Cobb would be free of racially motivated behavior, be safe from the irresponsible delegation of administrative power to the Honor Committee, and would be permitted to matriculate in an atmosphere of trust; (6) the defendants misrepresented the conditions and facts surrounding the mission of the Honor Committee; (7) the plaintiffs relied to their detriment upon information set forth in the University's handbook and the Honor Committee By-Laws; and (8) the Honor Committee wrongfully and incompetently misused its power to destroy the reputation and terminate the education of Cobb, who had refrained from lying, cheating, and stealing in compliance with the stated purpose of the University's Honor System.

The Court holds that the plaintiffs' breach of contract count is devoid of any claim upon which relief can be granted. Even assuming *arguendo* that a contract can be established with defendants other than the University, the allegations are insufficient to establish a breach. The plaintiffs' assertion that Cobb did not have a right to appeal his guilty verdict to a "responsible adult or adult leadership" is merely a characterization and does not constitute a breach of contract. Cobb exercised his right to an appeal and filed a grievance petition. Similarly, plaintiffs' contention that the defendants breached their contract with Cobb because the Honor Committee wrongfully misused its power to dismiss Cobb relies on Cobb's professed innocence. However, the evidence presented to the honor jury was sufficient to support a guilty verdict, *infra* part III.J, and the Court will not displace the honor jury's verdict absent a constitutional violation.

The plaintiffs' contention that the defendants misrepresented the Honor Committee's mission fails because the plaintiffs *do* not identify any specific misrepresentation.

The By–Laws state that the Honor System "exists to foster a cohesive bond of trust among all members of the university community and to instill in all students a mutual reverence for the ideal of honorable behavior." By–Laws at 1. However, a student is subject to a trial and dismissal only if the student lies, cheats, or steals. · *Id.* Since a jury found Cobb guilty of cheating beyond a reasonable doubt, the standard for dismissing a student was satisfied in accordance with the By–Laws. Finally, the defendants' alleged promise to abstain from racially motivated behavior is more properly characterized as a constitutional violation and it will be treated as such. *See infra* part III.D. Therefore, the Court grants the defendants' motion to dismiss the breach of contract claim.

## C. Violation of Human Rights

■ The alleged violations of human rights committed by the defendants consists of (1) dehumanizing minority students by initiating a higher percentage of honor investigations against minority students and rendering a guilty verdict against minority students in a greater number of cases; (2) conspiring by omission or commission to limit the number of minority students graduating from the University by charging and permanently dismissing a disproportionately greater number of minority students; and (3) the University administration's refusal to review the Honor Committee's decisions.

The Virginia Human Rights Act provides that it is the "policy of the Commonwealth of Virginia … [t]o safeguard all individuals within the Commonwealth from unlawful discrimination because of race … [in] educational institutions." Va.Code Ann. § 2.1–715 (Michie 1995). The Act also provides that the Commonwealth's policy is to protect its citizens "against unfounded charges of unlawful discrimination." *Id.* However, the Act does not create any new causes of action, but applies only where there is a violation of existing laws. Va.Code Ann. § 2.1–725 (Michie

1995). *See Ennis v. National Ass'n of Bus. & Educ. Radio*, 53 F.3d 55 (4th Cir. 1995). Plaintiff is therefore barred from bringing a claim under the Virginia Human Rights Act and this claim is dismissed.

## D. Constitutional Claims

### 1. Preliminary Considerations

The Fourteenth Amendment protects against state action that involves a deprivation of "life, liberty, or property, without due process of law ... [or a denial of] equal protection of the laws." U.S. Const. Amend. XIV, § 1. In analyzing a due process claim, a court must first determine whether a claimed interest constitutes life, liberty, or property within the Fourteenth Amendment. *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). If so, a court must then determine what process is due. *Id.* The Court will assume that Cobb had a protected property interest in his continued enrollment at the University. *See Henson v. Honor Committee of Univ. of Virginia*, 719 F.2d 69, 73 (4th Cir.1983); *Lewin v. Medical College of Hampton Roads*, 910 F.Supp. 1161, 1164 (E.D.Va.1996). The Court must then examine whether the disciplinary procedures used to dismiss Cobb were constitutionally adequate.

### 2. Substantive Due Process

Cobb's substantive due process rights were allegedly violated because (1) Michener's decision to file an accusation with the Honor Committee was the "result of bad faith and impressible motives and came only after he met plaintiff face to face and realized that plaintiff was an African–American," and (2) the Honor Committee's· decision to prosecute was arbitrary and capricious when the Committee did not have a "scintilla of evidence" to support a finding that Cobb was guilty of cheating.

 Cobb's "assumed property interest [in his continued enrollment at the University] gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action." *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 223, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985).[14] In *Roach v. University of Utah*, 968 F.Supp. 1446 (D.Utah 1997), the court reviewed the University of Utah's decision to dismiss a student based on disciplinary reasons. The court stated that "[t]o establish a violation of substantive due process, a student must demonstrate arbitrary and capricious conduct on the part of university officials by showing that there was no rational basis for the university's decision or must show that the dismissal was motivated by bad faith or ill will unrelated to academic performance." *Roach*, 968 F.Supp. at 1455 (citing *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 91–92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Harris v. Blake*, 798 F.2d 419, 424 (10th Cir. 1986); *Schuler v. University of Minnesota*, 788 F.2d 510, 515 (8th Cir.1986); and *Ewing*, 474 U.S. at 225, 106 S.Ct. 507).

 To the extent plaintiffs attack the facial validity of the By–Laws, the plain-

---

**14.** In *Ewing*, the Supreme Court examined the constitutionality of a student's expulsion from the University of Michigan based on academic reasons. 474 U.S. at 215–17, 106 S.Ct. 507. Courts have recognized a distinction between disciplinary and academic reasons for levying a punishment against a student. Academic based reasons are reviewed with greater deference than those concerning a student's violation of a school's disciplinary rule. For decisions involving academic reasons, a court's review is limited to an inquiry as to whether the decision "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 227, 106 S.Ct. 507. For suspensions or dismissals based on disciplinary reasons, due process requires notice and an opportunity for the student to be heard. *Roach v. University of Utah*, 968 F.Supp. 1446, 1454 (D.Utah 1997) (citing *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). However, the prohibition against arbitrary action appears to apply to both academic and disciplinary reasons. *See Roach*, 968 F.Supp. at 1454–55.

tiffs have not identified any changes in the Honor System which would compel this Court to reach a different conclusion than the Fourth Circuit in *Henson*. In *Henson*, the Court held that the procedures provided in the University's Honor System satisfied the Constitutional due process standard and listed the procedural protections afforded to accused students:

> [t]he student, for example, receives what is essentially an indictment, specifying both the charges and the factual allegations supporting them. He has a right to a hearing before a committee of his peers. He is entitled, at no personal cost, to have a student-lawyer represent his interests at all critical stages in the proceedings. He may also retain a practicing attorney to assist in his defense, although the attorney can assume no active role in the Honor trial itself. The individuals who brought the charges must face the student at the hearing and state the basis of their allegations. They, in turn, must submit to cross-examination by the student, or his designated student counsel, and by the members of the hearing committee. The student then has the right to present evidence in opposition to the charges and to offer witnesses for the sole purpose of bolstering his character. He may, if he chooses, demand that the hearing be conducted in public, where impartial observers can make an independent assessment of the proceeding's fairness. If, after hearing the evidence, four-fifths (⅘) of the committee members find the student guilty beyond a reasonable doubt, he has a right to appeal the decision to a five-member board comprised of members of the student government. This board is empowered to review the record of the Honor trial and to grant new trials when, in its judgment, the correct procedures were not followed or the evidentiary findings of the trial committee were deficient.

719 F.2d at 73 (citations to By–Laws omitted). These same or substantially similar procedural rights were in effect during Cobb's trial and appeal and Cobb was afforded those rights. *See* By–Laws at 5–11.

Accordingly, this Court holds that the Honor System itself does not violate the plaintiffs' substantive due process rights and this claim is dismissed. This finding also precludes the plaintiffs' requested prospective injunctive relief. The only injunctive relief requested was the "dissolution of the Honor Committee." Complaint at 29. Since the established procedures of the Honor Committee do not violate Cobb's substantive due process rights, the Court finds that even if the plaintiffs were able to successfully prove either a procedural due process or equal protection violation, the plaintiffs fail to state a claim upon which they would be entitled to an injunction ordering one or more of the defendant(s) to dissolve the Honor Committee. Nevertheless, the Court concludes that the plaintiffs' *pro se* complaint should be construed as requesting an injunction requiring one or more of the defendant(s) to vacate the honor jury's decision and readmit Cobb. This remedy would be available if the By–Laws were applied to Cobb in an unconstitutional manner. *See infra* parts III.D.3 and III.D.4.

Cobb also alleges that his substantive due process rights were violated because professor Michener's decision to file an accusation with the Honor Committee was the result of bad faith and impressible motives. However, during oral argument Cobb stated that Michener accused him of cheating because Michener thought he had actually cheated. With this concession at oral argument, the Court dismisses the claims against Michener.

### 3. Procedural Due Process

In addition to the plaintiffs' substantive due process claim, and unlike the plaintiff in *Henson*, the plaintiffs allege that their procedural due process rights were violated as a result of the defendants' failure to follow the procedures set forth in the By–Laws. These rules provide a per-

son charged of an honor violation the right to a speedy honor trial and set forth the expediency with which an honor advisor will be appointed to a defendant. The By-Laws state that "the initiator and the investigated student will each be assigned one advisor by the Vice Chair for Pre-Trial ... throughout the entire Honor System process." By–Laws at 6. Although accused of cheating in March, Cobb was not provided an advisor until the following Fall semester—long after the honor process had been initiated. The By–Laws also provide that "[f]or cases which have not proceeded to confrontation at the close of a class session—like fall semester, spring semester, and summer school—the advisors for the investigated students shall notify those students of the nature of the investigations."[15] In addition to not being provided with an honor advisor, Cobb was not notified by the Honor Committee of the nature of the investigation prior to the close of the Spring semester.

In *Jones v. Bd. of Governors of Univ. of North Carolina,* 704 F.2d 713 (4th Cir. 1983), the Court explained that deviating from an agency's established procedural guidelines in a disciplinary action is not necessarily a violation of constitutional rights:

> [N]ot every departure from a state agency's stated or customary procedures constitutes a denial of constitutionally guaranteed procedural due process. Indeed, the fundamental principle seems now established that in these cases the source of procedural guarantees is to be found solely in the due process clause rather than in any specific procedures provided by the state.
>
> Obviously, however, to the extent a state's procedures directly embody fundamental guarantees grounded in the due process clause, a significant departure from those procedures would as well violate the underlying constitution-

ally based guarantees. Furthermore, there persists in controlling decisions of the Supreme Court recognition that significant departures from stated procedures of government and even from isolated assurances by governmental officers which have induced reasonable and detrimental reliance may, if sufficiently unfair and prejudicial, constitute procedural due process violations. Finally, while it is established that procedural due process guarantees do not include any general requirement of reasonableness in a state agency's interpretation and application of its stated procedures, the Supreme Court has recently recognized that there exists the possibility of an interpretation so extreme as to be a violation of due process.

*Id.* at 717 (quotations and internal citations omitted). *See also Winnick v. Manning,* 460 F.2d 545, 550 (2nd Cir.1972) ("[not] every deviation from a university's regulations constitutes a deprivation of due process"). The Court must therefore determine whether the asserted violations of the By–Laws constitute a procedural due process claim upon which relief can be granted.

In *Dixon v. Alabama State Bd. of Education,* 294 F.2d 150 (5th Cir.1961), the Court described the minimum due process requirements for an academic expulsion for a disciplinary violation:

> The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the [University]. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a

---

**15.** This mandate does not appear in the copy of the By–Laws included in the plaintiff's complaint. However, the By–Laws provided to the Court are not dated and the Court will assume, for the purposes of the defendants' motion, that the provided language was included in the version of the By–Laws which was in effect at the time of Cobb's investigation and trial.

failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the ... administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities might be detrimental to the college's educational atmosphere and impracticable to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college.

*Id.* at 158–59. This due process standard was embraced by the Fourth Circuit in *Henson,* 719 F.2d at 74.

Applying the standards set forth in *Dixon,* the Court finds that the alleged procedural violations of the By–Laws—failure to immediately provide an honor advisor, and to both notify Cobb of the nature of his investigation and provide him with a trial before the Spring semester—did not violate fundamental guarantees grounded in the due process clause. Cobb was notified within a few weeks of taking the exam that he was under an honor violation investigation. He received an honor trial in which he testified and had an opportunity to call witnesses. His guilty verdict was rendered by a jury of twelve students in which a four-fifths majority vote was required. The guilty verdict was then upheld by a student appellate body. While having an honor advisor assigned to a student during the pre-trial process may be beneficial, the due process clause does not require such assistance.

The court in *Jones* also recognized that significant departures from a government's stated procedures which have "induced

reasonable and detrimental reliance may, if sufficiently unfair and prejudicial, constitute procedural due process violations." 704 F.2d at 717. Plaintiffs assert that the delay in the honor trial reduced Cobb's ability to remember his reasons for writing down the incorrect numbers on his exam. However, the delay from his March exam to his trial in December did not violate the By–Laws. The By–Laws provide that an initiation [16] "must occur within two years of the alleged incident." By–Laws at 5. Therefore, the Court finds that since the length of time between Cobb's exam and trial did not violate a time prescribed by the Honor System, the plaintiffs' due process theory of detrimental reliance is dismissed as to the time of the trial.

As to the actual delay in providing Cobb with a trial, the Supreme Court has recognized that a pre-indictment delay may be sufficiently prejudicial to constitute a due process violation. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Determining whether a pre-indictment delay violates due process requires a two-pronged inquiry:

First, a court must assess whether the defendant has suffered actual prejudice, and the burden of proving such prejudice is clearly on the defendant. If the threshold requirement of actual prejudice is met, the court must then consider the Government's reasons for the delay, balancing the prejudice to the defendant with the Government's justification for the delay. The basic inquiry then becomes whether the Government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'

*United States v. Automated Medical Laboratories, Inc.,* 770 F.2d 399, 403–04 (4th Cir.1985) (quoting *Lovasco,* 431 U.S. at 790, 97 S.Ct. 2044).

---

**16.** An initiation is defined as the "act of bringing a possible honor offense to the atten-

tion of the Honor Committee ...." Honor By–Laws at 5.

■ The plaintiffs contend that the approximately nine month delay from the exam to the trial prejudiced Cobb's defense because he was unable to fully recall the reasons for his exam answers. The Honor System's equivalent of an indictment is when the investigative panel "issues an accusation against the investigated student." By–Laws at 7. The By–Laws further provide that an "accused student then has ten days either to request a trial or to leave the University admitting guilt." *Id.* The investigative panel issued an accusation against Cobb on November 3, 1997. Complaint at 21. Regardless of whether the measuring period is from the time of the exam or the accusation, the plaintiffs fail to state a claim upon which relief can be granted. Satisfying the prejudice prong requires more than an assertion that Cobb could not recall every detail of the exam. *United States v. Scott,* 795 F.2d 1245, 1249 (5th Cir.1986) ("[a]ctual prejudice cannot be proven through generalized claims of memory loss or by a claim that delay necessarily causes prejudice."). *See also United States v. Lynch,* 56 F.3d 62, 1995 WL 325670 at *3 (4th Cir.1995) (unpublished) (quoting *Scott* with approval).

■ The plaintiffs also contend that Cobb detrimentally relied on the By–Laws which require advisors for investigated students to notify the student of the nature of the investigations. They assert that because Cobb was not advised of the status of the investigation by the end of the Spring semester, in violation of the By–Laws, he assumed that the charges had been dropped. As a result, Cobb did not prepare for his defense during the summer following the Spring semester. If true, and his reliance was reasonable, these allegations state a claim upon which relief can be granted (assuming that the departure from the procedures was significant). Therefore, the defendants' motion to dismiss is denied to the extent that plaintiffs

can demonstrate that (1) there were significant departures from the By–Laws concerning the appointment of an honor advisor which induced the plaintiffs' reasonable and detrimental reliance and (2) the reliance was sufficiently unfair and prejudicial to constitute a procedural due process violation. *See Jones,* 704 F.2d at 717.

### 4. Equal Protection Clause

Plaintiffs allege that Cobb's equal protection rights were violated for the following reasons: (1) several of the defendants failed to intervene with the Honor Committee's actions and the jury's decision; (2) Cobb was denied the right to appeal the Honor Committee's decision to a "higher authority," a right which is enjoyed by students of other Virginia colleges and universities; (3) the defendants conspired to limit the number of minority students graduating from the University by dismissing a disproportionately greater number of minority students than Caucasian students; and (4) Cobb was denied the same protection of the laws enjoyed by students whose instructors elect not to report violations of the University's Honor System.

■ The Court will first consider the allegation that the defendants conspired to limit the number of minority students graduating from the University by using the honor system to convict and dismiss minority students. The fact that a disproportionate number of minority students are charged and convicted of honor violations does not, standing alone, create a constitutional violation. *Butler v. Cooper,* 554 F.2d 645, 647 (4th Cir.1977) (holding that even if 98% of arrests were of African–Americans, "that fact alone is wholly inadequate to support" a charge of conspiring to deny African–Americans the equal protection of the law).[17] However,

---

17. *Butler* relies on *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), in which the Supreme Court stated that "our cases have not embraced the proposition that a law or other official act, without

regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." 554 F.2d at 647.

the equal protection clause "mandates that the decision to prosecute ... may not be based upon an unjustifiable factor such as race, religion, or another arbitrary classification." *United States v. Hastings*, 126 F.3d 310, 313 (4th Cir.1997) (internal quotations omitted). "A defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical denial' of equal protection of the law." *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting *Yick Wo. v. Hopkins*, 118 U.S. 356, 373, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).[18]

 In a claim of a racially biased prosecution, a defendant must establish "both (1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious or in bad faith." *Hastings*, 126 F.3d at 313. The complaint alleges that the defendants conspired to limit the number of minority students graduating from the University by dismissing minority students in disproportionately greater numbers than Caucasian students. During oral argument, plaintiffs alleged for the first time that the Honor Committee dismissed reported honor violations against several students based on the length of time their cases were pending. If true, and if those students' cases were substantially similar to Cobb's, the plaintiffs may be able to demonstrate that similarly situated individuals of a different race were not prosecuted. The "bad

faith" prong in *Hastings* is satisfied by the allegation that the defendants conspired to reduce the number of minority students graduating from the University. Therefore, taking into consideration the plaintiffs' *pro se* status, the Court finds that the plaintiffs have alleged sufficient facts which state an equal protection claim upon which relief can be granted. *See Butler v. Cooper*, 554 F.2d at 647.[19] Accordingly, the defendants' motion to dismiss the plaintiffs' equal protection claim is denied to the extent it alleges that similarly situated individuals of a different race were not prosecuted and the Honor Committee's decision to prosecute Cobb was either invidious or the result of bad faith.

 As to the other alleged violations of the equal protection clause, the Court finds that these allegations do not state a claim upon which relief can be granted. The plaintiffs allege that the Commonwealth, Governor Gilmore, Secretary of Education (Bryant), the Rector and Visitors of the University of Virginia, President of the University (Casteen), Vice President of Students (Harmon), and General Counsel for the University (Forch) abrogated their "right to intervene on behalf of an aggrieved student in favor of giving Defendant Honor Committee full authority to accuse, investigate, and mete out punishment to their student peers without supervision, interference or intervention by any responsible adult." The University's reliance on students to enforce the Honor System does not violate the Constitution's equal protection clause.

**18.** The Court in *Armstrong* discusses the broad discretion of federal prosecutors, who "have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" 517 U.S. at 464, 116 S.Ct. 1480 (quoting U.S. Const., Art. II, § 3 and referring to 28 U.S.C. §§ 516, 547). In holding that the Honor Committee's decision to prosecute is presumed to be motivated by proper considerations, this Court makes no finding concerning the degree of judicial def-

erence owed to the Honor Committee's decision.

**19.** In *Butler*, the Fourth Circuit found that a plaintiff satisfied the federal pleading standards for an equal protection violation by alleging that state officials and police officers conspired to deprive her of equal protection of the laws by disproportionate and racially selective enforcement of the laws. However, the Court upheld the district court's grant of summary judgment after the plaintiff failed to offer evidence refuting the defendants' affidavits. 554 F.2d at 647.

*Henson,* 719 F.2d at 73. In addition, contrary to the plaintiffs' assertions, the above named defendants, except for the Board of Visitors, did not possess a right to intervene in the Honor Committee's decision to uphold the jury's guilty verdict.[20] As for the Board of Visitors, the Board is empowered to "regulate the government and discipline of the students." Va.Code Ann. § 23–76 (Michie 1997). However, the extent of the Board's power to intervene is unclear from the pleadings and the defendants' motion to dismiss.

■ The plaintiffs also contend that Cobb's equal protection rights were violated because he was denied rights enjoyed by students of other Virginia colleges and universities. This allegation also fails to state an equal protection claim which could afford relief. Schools have a right to establish their own disciplinary procedures as long as those procedures comply with the constitutional due process requirements. *Compare Henson,* 719 F.2d at 73 (finding the University of Virginia's disciplinary procedures constitutional) to *Dixon,* 294 F.2d at 158–59 (upholding the constitutionality of Alabama State College's disciplinary procedures).

■ Finally, the plaintiffs assert that an equal protection violation arises from the fact that some professors report suspected honor violations to the Honor Committee while other professors refuse to utilize the Honor System. The University's Honor Committee is a reactionary body which relies upon a student or faculty member to report an alleged violation. By–Laws at 5. While students are bound by the Honor System, professors are encouraged but not required to report sus-

pected honor violations. *See* Exhibit 32 of the Complaint. The Court finds that an equal protection violation does not arise merely because some professors report a violation while others might not.

### G. Intentional Infliction of Emotional Distress

The intentional infliction of emotional distress count alleges the following: (1) defendants owed a duty of care to Cobb in presenting a witness who saw the alleged cheating take place or a test paper from which the defendant allegedly copied; (2) Cobb was accused of cheating without Michener nor the Honor Committee ascertaining if and how any cheating had occurred; (3) Cobb's property interest in a right to continued enrollment and graduation from the University was denied by the defendants' dismissal of Cobb without cause; (4) plaintiffs Darryl and Annette Cobb suffered distress and anxiety from the defendants' denial of their request for a review of Cobb's case by "responsible adults at the University;" and (5) Cobb suffers from depression which has required medical and psychological treatment.

■ To satisfy a *prima facie* case of an intentional infliction of emotional distress claim, a plaintiff must allege that (1) the defendant intended his specific conduct and he knew or should have known that his conduct would cause the plaintiff emotional distress; (2) the defendant's conduct was extreme and outrageous; and (3) the plaintiff suffered severe emotional distress which was caused by the defendant's conduct. *See Owens v. Ashland Oil, Inc.,* 708 F.Supp. 757 (W.D.Va.1989); *Gaiters v. Lynn,* 831 F.2d 51 (4th Cir.1987); *Womack*

20. The procedural remedies for an honor violation lie exclusively within the student run Honor System. There is only a single sanction provided for in the By-laws: "[t]he cardinal injunction of our system is that students must refrain from lying, cheating, and stealing in all its forms or else face permanent dismissal from the University." By–Laws at I. If a guilty verdict is rendered against a student, the student has a right to appeal to an appeal panel. If unsuccessful on appeal, a student can "present concerns regarding the fairness of the proceedings" to the Executive Committee which is comprised of five elected members of the Honor Committee. By–Laws at 2 and 11. This "Grievance" procedure is the "avenue of last resort," before a student is permanently dismissed. *Id.* at 11. *See also* Complaint Exhibit 32 which states in part that the "University Board of Visitors has delegated complete authority for the administration of the Honor System to students ...."

*v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974). To meet the second requirement, an employee must demonstrate that the defendant's behavior was so offensive that it falls beyond all generally acceptable bounds of decency. *Owens,* 708 F.Supp. at 760. A court may determine initially whether the conduct may reasonably be regarded as sufficiently extreme and outrageous. *Id.* (citing *Womack,* 215 Va. 338, 210 S.E.2d 145).

■ The Court holds that the alleged conduct by the defendants does not constitute extreme and outrageous conduct as defined in *Womack.* The alleged outrageous conduct was, in essence, following the Honor System's procedures for determining whether an accused student is guilty of an honor violation. The circumstantial evidence produced at Cobb's trial was sufficient to support a finding of guilt. *See supra* part I and *infra* part III.J. The Honor System's procedures are also constitutional. *See supra* parts III.D.2. Absent an allegation that any of the defendants' conduct was wrongful, much less "extreme and outrageous," the plaintiffs' intentional infliction of emotional distress count is dismissed.

## H. Defamation

The defamation count adds the following allegations: (1) Cobb was held up to ridicule, scorn, and contempt when the Honor Committee circulated information falsely advising several defendants that Cobb voluntarily terminated his University enrollment after admitting guilt to an honor violation; (2) that because the Honor Committee "generates an attitude that they are incapable of error," Cobb suffered a loss of esteem and is viewed with disdain by other University students; and (3) Cobb will be stigmatized his entire life for being expelled due to an honor violation for which he was wrongfully accused and convicted.

The purported false information was contained in a letter written by William Harmon, Vice President of Student Affairs, to Cobb on December 16, 1997, which stated in pertinent part that "[f]ormal notification has been received from the Honor Committee which indicates that you voluntarily terminated your enrollment in the University hereby admitting guilt to an honor violation." Copies of the letter were forwarded to Robert T. Canevari, Dean of Students, Stephen Plog, Associate Dean for Academic Programs, and April Fearnley, Vice Chair for Trials. In a letter dated December 27, 1997, Cobb denied the assertions that he had voluntarily terminated his enrollment in the University or had admitted guilt to an honor violation.

■ In an action for defamation, the "[p]laintiff may recover compensatory damages for wrongful injury to reputation upon proof, by preponderance of evidence, that publication was false, that defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain facts on which publication was based, where plaintiff is neither public official nor public figure and regardless of whether action is against media defendant." *Great Coastal Exp., Inc. v. Ellington,* 230 Va. 142, 334 S.E.2d 846, 852 (1985) (quoting *Gazette v. Harris,* 229 Va. 1, 325 S.E.2d 713, *cert. denied sub nom. Fleming v. Moore,* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985)).

■ The Court holds that the plaintiffs have stated a claim upon which relief can be granted. The defendants' motion to dismiss is therefore denied as it pertains to Harmon's letter on December 16, 1997. However, the plaintiffs' other allegations— the Honor Committee's attitude that it is incapable of error and the negative stigmatism associated with an honor conviction— do not state a claim for defamation as a matter of law. A defamation claim must be based on a publication. The publication criterion cannot be satisfied by an assertion that an organization "generates an attitude." In addition, the plaintiffs' stigmatization theory fails as a defamation claim because it relies on their assertion that Cobb was wrongfully convicted of an honor violation. However, the conviction was based on a constitutional procedure

and supported by adequate circumstantial evidence. *See supra* part I and *infra* part III.J. As such, the central element of a defamation claim, requiring a publication to be false, is not satisfied. *Shenandoah Pub. House, Inc. v. Gunter,* 245 Va. 320, 427 S.E.2d 370, 372 (1993) ("[w]ithout proof of falsity, there can be no recovery for defamation").

## I. Defendants Dismissed based on Insufficient Allegations

 The allegations against the University administrators consist of attending a meeting with the plaintiffs after Cobb was found guilty of cheating and failing to overturn the jury panel's decision despite knowing that he was innocent. John Casteen, the President of the University, is also alleged to have known of Cobb's innocence and failed to overturn the jury panel's decision. The same allegation is made against William Harmon in addition to the defamation claim. The Court finds that neither the Commonwealth officers, Casteen, Harmon, nor the named University administrators had any authority to overturn an honor jury's guilty verdict, *supra* note 20, and, except for Harmon, these parties are dismissed both in their individual and personal capacities for all counts.[21] As to Harmon, all claims against him are dismissed except for the defamation count.

 A different analysis must be undertaken for the individual members of the Board of Visitors. The Board is empowered to "regulate the government and discipline of the students," Va.Code Ann. § 23–76, and has delegated this power to the Honor Committee. *See supra* note 20. The Board's power over student discipline is relevant only if the By–Laws are either facially unconstitutional or were applied to Cobb in an unconstitutional manner. Here the only surviving constitutional claims concern the Honor Committee's application of the By–Laws. If Cobb is able to prove that the Honor System's provisions were enforced against him in an unconstitutional manner, the Court may have the power to grant a prospective injunction requiring the members of the Board of Visitors to vacate the honor jury's guilty verdict and readmit Cobb.[22] *See supra* part III.D.2. Therefore, the defendants' motion to dismiss the individual members of the Board of Visitors is denied as to their official capacities and granted as to their personal capacities.

Weston Fox and Virginia Sharma were the Honor Committee Investigators assigned to represent Cobb and Michener respectively. They are alleged to have removed several lines [23] of both Michener

---

**21.** In *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court held that liability under § 1983 can not attach if a defendant merely failed to act to prevent a constitutional deprivation. *See also Monell v. Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent"); *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1246 (6th Cir.1989). The holding in *Rizzo* was based on the lower court's finding that none of the state defendants had deprived the plaintiffs of rights secured under the Constitution. *Id.* Here the plaintiffs' complaint does not contain any allegations that the members of the Board of Visitors, University administrators, Casteen, or Harmon played any affirmative part in depriving the plaintiffs of any constitutional rights. *Id.* Thus, the plaintiffs'

claimed constitutional violations rest on a failure to act theory and there is no need to go outside the pleadings to determine that the aforementioned parties did not commit an affirmative act depriving the plaintiffs of any constitutional rights.

**22.** The relationship between the Board of Visitors and the Honor Committee has not been fully developed for this motion. It would therefore be premature for the Court to speculate on its capacity to enjoin the members of the Board of Visitors.

**23.** The removed lines were contained in the answers provided by Michener and Cobb during the investigative stage. A portion of Michener's answer to the question "What happened after you graded the second test?" was redacted. Michener's initial answer to another question was changed from "[Cobb] was hanging on by his finger nails with a 2.1 [Grade Point Average]" to "[Cobb's] GPA in

and Cobb's transcribed testimony during the investigative phase.[24] The By–Laws provide that "only objective statements of fact be recorded within the log .... [and][v]alue judgments and opinions from the investigator are not relevant evidence and should not be included in any capacity." The plaintiffs had no constitutional right to have the investigative interviews recorded and transcribed. *See Carey on Behalf of Carey v. Maine School Admin. Dist. No. 17*, 754 F.Supp. 906, 920 (D.Me. 1990). Moreover, the plaintiffs do not allege that the removal of several lines from the initial investigative report prejudiced Cobb's defense either at trial or in developing the facts for trial. Cobb had ample opportunities to testify in front of the jury and the appeal board. The Court finds that these allegations fail to state a claim upon which relief can be granted and the claims against both Fox and Sharma are dismissed.

### J. Actual Innocence

 Plaintiffs accuse the honor jury of rendering an "arbitrar[y] and capricious[ ]" guilty verdict without the benefit of any witnesses or evidence to support a finding of cheating. Insofar as this states a claim of actual innocence, the Court finds that the evidence presented at the honor trial was not so insubstantial that it could not support a guilty verdict. The numbers contained in Cobb's answers did not match the numbers provided in his exam, but rather matched the numbers provided in the alternate exam. During Cobb's honor trial, Michener testified that it was "extraordinarily improbable" that Cobb committed an honest mistake when he used the incorrect numbers. *See supra* p. 821–822. The jury based its decision on Cobb and Michener's testimony and Cobb's exam and answers compared with the alternate exam. While the plaintiffs dispute the inferences to be drawn from the evidence, the Court holds that a reasonable fact finder could conclude that Cobb was guilty of cheating based on the circumstances of his case. Therefore, the members of the honor jury are dismissed because the allegations against them fail to state a claim upon which relief can be granted.

### Conclusion

The Court GRANTS defendants' motion to dismiss as to the breach of fiduciary duties, breach of contract, violation of human rights, intentional infliction of emotional distress, and substantive due process counts in their entirety. The defendants' motion to dismiss is DENIED as to the plaintiffs' procedural due process claim to the extent that plaintiffs can demonstrate that (1) there were significant departures from the By–Laws concerning the appointment of an honor advisor which induced the plaintiffs' reasonable and detrimental reliance, and (2) the reliance was sufficiently unfair and prejudicial to constitute a procedural due process violation. The defendants' motion to dismiss the plaintiffs' equal protection claim is DENIED to the extent plaintiffs allege that similarly situated individuals of a different race were not prosecuted and the Honor Committee's decision to prosecute Cobb was either invidious or the result of bad faith. The defendants' motion to dismiss the plaintiffs' defamation claim is DENIED to the extent it pertains to Harmon's letter on December 16, 1997.

The following defendants are also dismissed, in both their official and personal capacities (where applicable): the Rector

---

economics courses is not very much above 2.0." Finally, the defendants removed the other accused student's name from Michener's answer. Complaint Exhibits 8 & 9. The defendants also redacted one line from Cobb's answer to the question "What happened when the professor passed the test back?" Complaint Exhibit 12.

**24.** The allegation of removing lines from the investigative report is not a specifically enumerated count but is contained in the complaint's chronological account of the alleged facts. Complaint at 19–21.

and Visitors of the University of Virginia, Commonwealth of Virginia, James S. Gilmore, III, Wilbert Bryant, John Casteen, Robert Canevari, Stephen Plog, Paul Forch, Richard Kast, Ronald Michener, Virginia Sharma, Weston Fox, Unknown Members of Jury Trial, "First Name Unknown" Showalter, and Josh Sandblute. The individual members of the Board of Visitors[25] are dismissed in their personal capacities but will remain as defendants in their official capacities to the extent that the plaintiffs are entitled to prospective injunctive relief. The remaining individual defendants will not be dismissed in either their personal or official capacities.[26]

The Clerk is requested to send certified copies of this Memorandum Opinion to all parties of record.

### ORDER

Defendants[1] filed two separate motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), one in the named defendants' official capacities and one in their personal capacities. Both motions allege that the complaint fails to state a claim upon which relief can be granted. For the reasons stated in the accompanying memorandum opinion, it is hereby

### ADJUDGED AND ORDERED

that the defendants' motion to dismiss as to the breach of fiduciary duties, breach of contract, violation of human rights, intentional infliction of emotional distress, and substantive due process counts in their entirety is GRANTED. The defendants' motion to dismiss is DENIED as to the plaintiffs' procedural due process claim to the extent that plaintiffs can demonstrate that (1) there were significant departures from the By–Laws concerning the appointment of an honor advisor which induced the plaintiffs' reasonable and detrimental reliance, and (2) the reliance was sufficiently unfair and prejudicial to constitute a procedural due process violation. The defendants' motion to dismiss the plaintiffs' equal protection claim is DENIED to the extent plaintiffs allege that similarly situated individuals of a different race were not prosecuted and the Honor Committee's decision to prosecute Cobb was either invidious or the result of bad faith. The defendants' motion to dismiss the plaintiffs' defamation claim is DENIED to the extent it pertains to Harmon's letter on December 16, 1997.

The following defendants are also dismissed, in both their official and personal capacities (where applicable): the Rector and Visitors of the University of Virginia, Commonwealth of Virginia, James S. Gilmore, III, Wilbert Bryant, John Casteen, Robert Canevari, Stephen Plog, Paul Forch, Richard Kast, Ronald Michener, Virginia Sharma, Weston Fox, Unknown

---

**25.** John Ackerly, III, Franklin Birckhead, Charles Caravati, Champ Clark, William Crutchfield, Hovey Dabney, William Goodwin, T. Keister Greer, Elsie Goodwyn Holland, C. Wilson McNeely, III, Timothy Robertson, Terrence Ross, Albert Small, Elizabeth Twohy, Henry Valentine III, Walter Walker, Benjamin Warthen, James Wheat, III, Joseph Wolfe, Alexander Gilliam, Jr., and Kristine LaLonde.

**26.** To the extent that the plaintiffs will be able to prove a constitutional violation it is unclear for the purpose of this motion which members of the Honor Committee would be responsible for any violation. The Court will also leave open the question of whether the individual members of the Honor Committee are capable of being sued in an official capacity since the issue has not been fully briefed.

**1.** The following named defendants joined one or both of the motions to dismiss: The Rector and Visitors of the University of Virginia, the Honor Committee of the University of Virginia, the Commonwealth of Virginia, James S. Gilmore, III, Wilbert Bryant, John Ackerly, III, Franklin Birckhead, Charles Caravati, Champ Clark, William Crutchfield, Hovey Dabney, William Godwin, T. Keister Greer, Elsie Goodwyn Holland, C. Wilson McNeely, III, Timothy Robertson, Terrence Ross, Albert Small, Elizabeth Twohy, Henry Valentine, III, Walter Walker, Benjamin Warthen, James Wheat, III, Joseph Wolfe, Alexander Gilliam, Jr., John Casteen, William Harmon, Robert Canevari, Stephen Plog, Paul Forch, Richard Kast, Ronald Michener, Elizabeth Bibb, Edmond Cox, Nicole Eramo, April Fernley, Weston Fox, Kristine LaLonde.

Members of Jury Trial, "First Name Unknown" Showalter, and Josh Sandblute. The individual members of the Board of Visitors [2] are dismissed in their personal capacities but will remain as defendants in their official capacities to the extent that the plaintiffs are entitled to prospective injunctive relief. The remaining individual defendants will not be dismissed in either their personal or official capacities.

The Clerk is requested to send certified copies of this Order to all counsel of record and the *pro se* plaintiffs.

2. John Ackerly, III, Franklin Birckhead, Charles Caravati, Champ Clark, William Crutchfield, Hovey Dabney, William Goodwin, T. Keister Greer, Elsie Goodwyn Holland, C. Wilson McNeely, III, Timothy Robertson, Terrence Ross, Albert Small, Elizabeth Twohy, Henry Valentine III, Walter Walker, Benjamin Warthen, James Wheat, III, Joseph Wolfe, Alexander Gilliam, Jr., and Kristine LaLonde.