**Jonathan COBB, Darryl Cobb, and Annette Cobb, Plaintiffs,**

**v.**

**The RECTOR AND VISITORS OF the UNIVERSITY OF VIRGINIA, et al., Defendants.**

**No. 3:99CV00007.**

United States District Court, W.D. Virginia, Charlottesville Division.

Feb. 18, 2000.

Jonathan Cobb, Darryl Cobb, Annette Cobb, pro se.

Patrick B. Kelly, Susan M. Davis, Associates General Counsel and Special Assistants Atty. General, University of Virginia Office of General Counsel, Charlottesville, VA, for Defendants.

## MEMORANDUM OPINION

MOON, District Judge.

Defendants' filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to all remaining claims in this case. Defendants have also moved to dismiss any claims made by Darryl and Annette Cobb, parents of Jonathan Cobb, for lack of standing. Because there are no material facts to support Jonathan Cobb's claim, and because Jonathan Cobb's parents lack standing, defendants' motions will be granted.

## FACTS[1]

Plaintiff Jonathan Cobb ("Cobb"), an African–American and former student of the

1. The factual background in this case can also be found in this Court's memorandum opin-

University of Virginia ("University"), was discharged from the University in the Fall semester of 1997 for cheating on an Economics 371 examination given on March 5, 1997. Cobb was found guilty of cheating by a randomly selected student jury pursuant to the University's Honor System on December 6, 1997. After Cobb's honor conviction, the Honor Committee's appeals panel upheld the jury's guilty verdict. Cobb exhausted his final avenue of relief under the Honor System when his request for a Grievance Panel was denied. The Honor System is governed by the Honor Committee By-Laws ("By-Laws"). The Honor Committee itself is comprised of University students who are elected by their peers. The Honor Committee is charged with enforcing the University's Honor System after an alleged honor violation is reported.

The honor investigation of Cobb began when Ronald Michener, the professor of the economics class, filed an honor violation with the Honor Committee four days after the exam. A photocopy of Cobb's exam was returned to him on March 17, 1997, with the words "pending investigation" written on it. Cobb, along with another African–American student with a similarly marked exam, went to Michener's office where they were told that they were suspected of cheating. They were also instructed to contact the Honor Committee concerning their case. That same day, they went to the Honor Committee's office and were advised that they would be contacted by an Honor Committee advisor[2] to assist them with defending their case.

Despite the Honor Committee's assurances, no one contacted Cobb for the remainder of the semester nor the following summer. Cobb proceeded to register for classes for the Fall 1997 semester and paid approximately $8,000 in tuition and fees. In late September or early October, Cobb was notified by Erika Werner that she had been assigned as his advisor by the Honor Committee. The Honor Committee investigated Cobb's case from September 26, 1997 to October 7, 1997. After the investigation, the Honor Committee decided to charge Cobb with cheating.

The facts surrounding the economics examination are as follows. Professor Michener initially suspected another student of cheating on a previous exam.[3] In response, Michener devised two versions of the March 5th exam with only slight deviations in the questions.[4] The exam consisted of three questions. Question 1 contained two subsections: (a) and (b). Questions 2 and 3 each contained three subsections: (a), (b), and (c). Cobb wrote down a response for Questions 1(a), 2(a), (b), and (c), and 3(a). These questions are listed below:

1) A woman buys a carton of eight eggs at the store, brings it home, and hard boils five of them for egg salad sandwiches. She separates the raw eggs from the cooked ones in the refrigerator, but her spouse unknowingly rearranges the refrigerator, mixing them together.

a) The next morning she needs two hard boiled eggs for sandwiches. What is the probability she will find

ion of July 7, 1999. *See Cobb v. Rector and Visitors of the Univ. of Va.,* 69 F.Supp.2d 815, 819–23 (W.D.Va.1999).

2. Honor advisors are assigned to students in order to "(a) provide students going through the system, including initiators, with emotional and confidential support; and (b) to provide the parties to which they are assigned with neutral and impartial information about the process they will be experiencing." By–Laws at 3.

3. No charges were brought against the original suspected student.

4. Michener numbered the tests and stacked them so that the two versions of tests alternated. He then instructed his teaching assistant to hand out a stack of tests to each row of students. The scheme was designed so that students sitting next to each other would have a different test. However, Michener admitted during the honor trial that he did not know in fact whether the students sitting around Cobb had a different version of the test than Cobb. Moreover, he testified that he "found nothing ... that bore either on [Cobb's] innocence or his guilt in any of the consecutively numbered tests." Trial Testimony at 14.

two that are hard boiled without having to break more than 3 eggs?

2) The number of minutes it takes to grade a midterm exam is a random variable with the following distribution (in minutes):

| x | f(x) |
|-----|------|
| 5 | .50 |
| 10 | .25 |
| 15 | .20 |
| 20 | .05 |

a) What is the mean and variance of the time it takes to grade an exam?

b) If there are 42 students who took the exam, what is the probability the total grading time will exceed six hours?

c) Tests that take 15 minutes or more to grade are considered "hard to grade." What is the chance that 12 or more of the 49 exams will be "hard to grade."? {Hint: for full credit, use continuity correction}

3) An architect wishes to design doors so that 95 percent of all people have at least a 1 inch clearance when passing through.

a) If people have a mean height of 66 inches and a standard deviation of 4 inches, how high must the doors be? (Assume that people's heights are a normally distributed random variable.)

Question 1(a) of the other exam was identical to Cobb's exam except the women in the other exam boiled four out of the eight eggs instead of the five eggs in Cobb's exam. In filling out the equation needed to compute the answer, Cobb used the number four instead of the number five as was required on the test he was given. At the honor trial, Michener testified that

So, × = 2 is the number of successes in this case, the number of hard boiled eggs, and then r = 4, that number corresponds to the number of successes that exist in the population, and in that case, that's the number of hard boiled eggs there are in the refrigerator and if you look at Jonathan's test, the correct

number for r is 5. If you look at the other version of the test, you'll see the correct version for r is 4.

\* \* \* \* \* \*

... the numbers on his paper correspond with the calculation for exactly 2 hard boiled eggs as if it appeared on the other test. Now the calculation happens to be carried out correctly for that piece, 2456 which is, as you'll note on Jonathan's text, is sort of what he ends up with, so there's a manipulation of the formula to determine the number for that term is correct. Let me just draw your attention to the fact that the mistake here is a mistaken [sic] in terms of writing down the givens of the problem. In other words, this is a word problem and you have to go through the word problem. You have to figure out what N is, what n is, what × is and what r is, and the givens are just written down. Generally people write down sort of what's given in the test and then they start manipulation. I don't [know] how you'd would [sic] get the wrong givens in anyway [sic] than what's on the other person's test.

Trial Testimony at 3.

Cobb's answer to question 2(b) is complicated by a drafting error in question 2(c) of Cobb's test. Michener inadvertently used the number 49 in question 2(c) of Cobb's test instead of the number 42 which was set forth in question 2(b). Michener testified that when he changed the numbers to create the two versions, he only altered question 2(b) and neglected to make a corresponding change to question 2(c). In answering question 2(b), Cobb used the number 49 which, Michener conceded at trial, could have originated from question 2(c) and not from the other test.

Question 3(a) of the other test used a mean height of 67 inches with a standard deviation of 3 inches instead of the corresponding 66 and 4 inches in Cobb's test. At the honor trial, Michener testified that the

givens of the problem [in Cobb's test] are if people have a mean height of 66 inches and a standard deviation of 4 inches, now a very basic matter of notation and something that I think every student in the class almost certainly understood ... is that mu was sort of the universal notation for mean and sigma is the universal notation for the standard deviation. What Jonathan has written immediately to the left of 3A is mu equal 67 and sigma equals 3. Now, if you look at the other test, it is true on the other test that mu equal 67 and sigma equals 3, but 66 and 4 are the numbers [on Cobb's test].

*See* Trial Testimony at 3.

At his honor trial, Cobb tried to explain how he innocently generated the incorrect numbers. Regarding the question 1(a), where he used four eggs instead of five eggs, he testified that he believed that in order to correctly calculate the answer he needed to use a formula containing n–1 as the variable representing the number of successful attempts (*i.e.* hard boiled eggs). Trial Testimony at 20. Applying n–1 to the numbers contained in question 1(a), Cobb testified that he took the five hard boiled eggs, subtracted one from that number and obtained the number four. *Id.*

For question 2(b), Cobb offered the following testimony:

When I got down to Part B, I was quite confused on this part, so I started doing part B and what I can recall, I looked on my equation and I saw for 6.3, I saw the z equation, but I wasn't sure which numbers to use so I started on Part C and for that equation I first thought of using equation 6.2. Yes, 6.2. Then, again, on Part C, I really didn't know what I was doing, so I just did quit that and I went back to Part B and as far as the z equation, instead of using the 42 students who took the exam, I took the 49—at this point, I was basically just trying to punch numbers in my calculation. I wasn't sure which equation to use. I knew which equation to use was the equation, but I wasn't sure which numbers to plug into the equation. I ended up using 49 as my sigma.

*Id.*

As to question 3(a), where Cobb used 66 and 3 inches instead of 67 and 4 inches, respectively, Cobb explained that

[W]hen I read at least 1 inch, I thought maybe that clued into me that maybe I should do something with that 1 inch. I took the 1 inch into account within the problem so for the mean, I took the inch and I added that to the 67, to the 66, which I wrote off to the left hand side and then for the standard deviation I subtracted 1 which gave me 3 which I wrote off to the left hand side. And as far as adding and subtracting, I wasn't sure if you were supposed to add the 1 inch to the mean or subtract the 1 to, add or subtract the 1 to the standard deviation. Also, you can see I had the $1.65 = \times$ cube, that is $\times$ cubed minus 1 on 67. As Mr. Michener said, it totally doesn't make any sense and after going back and looking through my notes on that chapter, I totally agree with him that I had no clue what I was doing and $\times$ cubed minus 1, I don't know where I got that from, cause it wasn't on my equation sheet and I'm not exactly sure where I got that equation from. Obviously, I was just rambling, trying to make equations, trying to get partial credit for something written down even though Mr. Michener wouldn't have given it to me cause it was clearly senseless . . . .

Trial Testimony at 21. The following dialogue occurred in regards to question 3(a):

Juror: "[H]ow come like 67 and 3 were even an option even though like it wasn't anywhere in the equation . . . ?"

Cobb: "I could've easily subtracted 1 from 66 to get 65 or add 1 to 4 and get 5."

Juror: So you did both?

Cobb: No. I'm just saying on that particular time when I was taking the

test, I added 1 to 66, subtracted 1 from [4]. But, I mean, if it was another time maybe I would've added, subtracted 1 from 66. I just wasn't sure if I was supposed to add or subtract which you weren't supposed to do at all . . . .

Trial Testimony at 24.

Michener testified that in his opinion the "strongest and most unambiguous evidence of cheating is in question 1A and 3A, but I think there's some additional evidence in 2B." Trial Testimony at 3. As to a person making all three mistakes, Michener stated that

> I would say that any one of these is an honest mistake is highly improbable and that several of them on the same test are just extraordinary improbable. I mean, any one of these, in and of itself, it sort of a once in a decade kind of mistake at most, and to see that many

together seems to me to be just hugely unlikely.

Trial Testimony at 13. In finding Cobb guilty of cheating,[5] the jury gave greater weight to the circumstantial evidence and Michener's testimony than to Cobb's explanations as to how he innocently arrived at his answers.

After the jury trial, Cobb requested an Appeal Hearing and one was held on February 18, 1998. The appeal panel upheld Cobb's guilty verdict.[67] Cobb attempted to exercise his last avenue of relief by requesting a Grievance Panel.[8] However, in a letter dated October 2, 1998, the Executive Committee declined to grant Cobb's request:

> After careful review of your file, the Executive Committee decided not to grant a Grievance Panel in regards to the above-captioned matter. The Committee did not make this decision lightly.

5. To render a guilty verdict, the trial panel must determine that the "evidence against the accused student demonstrates, beyond a reasonable doubt: (a) that the accused student committed an act of lying, cheating, and/or stealing; (b) the accused student knew or should have known at the time of the act that his or her action is or could be considered an honor offense; and (c) that the offense was of such a serious nature that open toleration of it would be inconsistent with the ideals of honor currently embraced by the community of trust." By–Laws at 10.

6. The By–Laws provide:
 [1] The dismissed student can appeal on two grounds: (a) an appeal for good cause; and (b) an appeal because of new evidence. For any good cause appeal, the dismissed students must describe the grounds for appeal, state whether they desire a closed or open appeal, and designate their choice of counsel.
 [a] For an appeal on good cause, dismissed students must show:
 (1) that they had not waived their right to appeal, and that they were denied an explicit right in the [Honor Committee] Constitution; or
 (2) that they were denied a "full and fair hearing" or right that is implicit in these by-laws and that the denial of a "full and fair hearing" or implicit right more likely than not affected the outcome of the trial.

 [b] For an appeal because of new evidence, the dismissed student must show that the new evidence would have more likely than not affected the outcome of the trial.
 [2] The appeal panel shall be composed of five Committee members. A grant for a new trial requires a three-fifths vote of the panel.
 By–Laws at 11.

7. On appeal, Cobb contended *inter alia* that the delay in having a trial prejudiced his defense. After a full hearing, the appeals panel held that the "evidence presented . . . was not sufficient to constitute showing of a good cause appeal . . . ." Exhibit 19 at 21.

8. In regard to the grievance procedures, the By–Laws provide:
 Purpose: As an avenue of last resort, the honor Committee will allow dismissed students to present concerns regarding the fairness of the proceedings which led to their dismissal.
 [1] Dismissed students who have exhausted their right to an appeal may submit a letter expressing their grievances, along with any relevant evidence, to the Executive Committee. The Executive Committee may then present the grievance to the full Committee at their discretion.
 By–Laws at 11.

Each member reviewed the file personally, including the evidence file, trial tapes and interview with the support officers involved. Though there were some irregularities in the adjudication of your case, we feel the proceedings were fundamentally fair and the jury verdict of December 6, 1997 stands.

Complaint Exhibit 21.

Cobb brought suit against the University and numerous other individually-named defendants. The complaint included the following claims: (1) Breach of Fiduciary Duty; (2) Breach of Contract; (3) Violation of Human Rights; (4) Denial of Equal Protection of the Laws; (5) Denial of Substantive Due Process of Property Rights; (6) Denial of Procedural Due Process; (7) Intentional Infliction of Emotional Distress; and (8) Defamation. On July 7, 1999, this Court granted defendants' motion to dismiss all but the equal protection, procedural due process, and defamation claims. *See Cobb v. Rector and Visitors of the Univ. of Va.*, 69 F.Supp.2d 815 (W.D.Va.1999) (hereinafter "memorandum opinion").[9] In the memorandum opinion, the defendants' motion to dismiss the plaintiff's equal protection claim was denied to the extent plaintiff alleged that similarly situated individuals of a different race were not prosecuted and the Honor Committee's decision to prosecute him was either invidious or the result of bad faith. *See id.* at 831. Similarly, this Court noted that the procedural due process claim could go forward so long as the plaintiff could demonstrate that there were significant departures from the By–Laws concerning the appointment of an honor advisor which induced his reasonable and detrimental reliance and the reliance was sufficiently unfair and prejudicial to constitute a procedural due process violation. *See id.* at 830. Finally, the defendants' motion to dismiss the plaintiff's defamation claim was denied to the extent it pertained to a December 16, 1997 letter by University Vice President for Student Affairs William W. Harmon. *See id.* at 833.

Discovery ensued, and defendants are now moving to dismiss Cobb's parents and for summary judgment on the three remaining claims. For the reasons set forth below, defendants' motions shall be granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment should only be granted if, viewing the record as a whole in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir.1985). When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with evidence to establish the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## DISCUSSION

### 1. Claims of Darryl and Annette Cobb

■ Defendants have moved to dismiss any claims made on behalf of Darryl and Annette Cobb for lack of standing. Darryl and Annette Cobb concede that they are not suing the defendants on their own behalf for injuries caused to them personally. Instead, they are advocating on behalf of their son, who is proceeding *pro se.* Because Jonathan Cobb has reached the age of majority, any and all claims of Darryl and Annette Cobb must be dismissed.

### 2. Equal Protection Claim

■ To establish a claim of racially-biased prosecution, plaintiff must demon-

---

**9.** The memorandum opinion also dismissed numerous individual defendants, the Rector and Visitors of the University of Virginia, and the Commonwealth of Virginia.

strate that his prosecution by the Honor Committee "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). In the memorandum opinion, this Court noted that plaintiff must produce competent evidence (1) that similarly-situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute him was invidious or in bad faith. *See Cobb*, 69 F.Supp.2d at 831,*citing United States v. Hastings*, 126 F.3d 310, 313 (4th Cir.1997).

■ Defendants successfully argue that plaintiff has failed to meet his burden of proof. Specifically, plaintiff relies on raw statistics to argue that a greater number of minority students are charged with and convicted of honor violations. However, this Court has already noted that statistics, standing alone, do not create a constitutional violation. *See id.* at 831, *citing Butler v. Cooper*, 554 F.2d 645, 647 (4th Cir.1977). Indeed, the actual evidence in the case indicates that race was not a factor in Cobb's honor prosecution.

Three other students were charged with honor violations on Michener's exam. Of the three other students, one was African American and two were Caucasian. The Honor Committee dropped its case against the African American student at the investigation stage after concluding that there was insufficient evidence to proceed to trial.[10] The case against one of the Caucasian students was prosecuted to trial, resulting in a not guilty verdict. The other Caucasian student left the University after he was formally accused of the charge and his whereabouts are unknown; thus, prosecution against him is pending and he will be tried if he ever returns to the University (though his readmission to the University is currently blocked).

Moreover, plaintiff has failed to produce any concrete evidence of other students who were spared prosecution because of their race. At oral argument he mentioned the case of a Caucasian student named Christopher Leggett, who was provided with another trial after two years of challenges between 1992 and 1994. Plaintiff also mentioned a 1997 case involving a group of students whose charges were apparently dropped on timeliness grounds.[11] However, the plaintiff's notation of these incidents, by itself, is insufficient to survive defendants' motion for summary judgment. Plaintiff has failed to come forward with credible and concrete evidence that similarly-situated individuals of a different race were not prosecuted, since he has not shown that these individuals in fact were similarly-situated.[12] Summary judgment

10. Plaintiff argues that the African American student also charged with an honor violation was his study partner, that he and his study partner had the same identical errors on their examinations, and that he and his study partner took the examination at different times, in different sessions, and without any opportunity to communicate with each other between the taking of the exams. However, while this argument addresses the issue of Cobb's actual guilt or innocence (which is not before this Court and was already decided at the honor trial), it does not address the equal protection claim he raised (i.e., whether similarly-situated individuals of a different race were not prosecuted and whether the decision to prosecute Cobb was invidious or in bad faith).

11. Plaintiff states that he was unable to obtain more specific evidence concerning those students because the University destroys the files for all students found not guilty of honor violations. However, there is no evidence that the University destroys the files in anticipation of litigation; instead, it appears to be the regular practice of the University to destroy records of students found not guilty in order to protect those individual students' interests.

12. For example, in the 1997 case it is possible that a significant period of time occurred between the alleged offense and the initiation date, thus differentiating that case from Cobb's (where charges were initiated four days after the exam). There are other conceivable factors that differentiate that case, the Leggett case, and Cobb's case. However, plaintiff has an affirmative obligation to come forward with concrete evidence that similarly-situated students were not prosecuted. Without controlling the variables by showing that the factual scenarios surrounding these events

places an affirmative burden on plaintiff to produce concrete evidence on which a trier of fact may reach a reasonable decision; plaintiff's mere mentioning of these prior incidents, without any additional evidence concerning the circumstances surrounding these cases, is insufficient to withstand defendants' motion.

Finally, plaintiff has failed to produce any proof that the decision to prosecute him was made in bad faith. Like proof that similarly-situated students were not prosecuted, evidence of intent must be clear and convincing. *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Plaintiff has failed to meet that burden. Accordingly, summary judgment must be granted to the defendants on the equal protection claim.

### 3. The Procedural Due Process Claim

■ Plaintiff's procedural due process claim centers on the fact that he was first contacted by an honor advisor in the Fall of 1997, despite the fact that the exam was administered and charges were filed the previous spring semester. In the memorandum opinion, this Court ruled that plaintiff may sustain his procedural due process claim only if he can demonstrate that (1) there were significant departures from the By–Laws concerning the appointment of an honor advisor which induced his reasonable and detrimental reliance, and (2) the reliance was sufficiently unfair and prejudicial to constitute a procedural due process violation. *See Cobb*, 69 F.Supp.2d at 830, *citing Jones v. Board of Governors of Univ. of North Carolina*, 704 F.2d 713, 717 (4th Cir.1983). Plaintiff has failed to meet the above requirements.

Defendants have now shown that there was no departure, significant or otherwise, from the By–Laws concerning the appointment of Cobb's honor advisor. At the motion to dismiss stage, this Court allowed Cobb's due process claim to advance based on one provision in the Honor Committee By–Laws:

For cases which have not proceeded to confrontation at the close of a class session—like fall semester, spring semester, and summer school—the advisors for the investigated students shall notify those students of the nature of the investigations.

*Id.* at 828. In citing the provision, this Court noted:

This mandate does not appear in the copy of the By–Laws included in the plaintiff's complaint. However, the By–Laws provided to the Court are not dated and the Court will assume, for purposes of the defendants' motion, that the provided language was included in the version of the By–Laws which was in effect at the time of Cobb's investigation and trial.

*Id.* at 828 n. 15. The defendants have now demonstrated that the above provision was adopted by the 1997–98 Honor Committee and was not incorporated into the By–Laws until November 24, 1997. Since Cobb's case was initiated on March 10, 1997, it was not subject to the above notification clause. Instead, under the system in place at the time, an advisor's first contact with an accused student generally occurred just before the confrontation interview by student investigators. In this case, Cobb was first contacted by his advisor sometime in September or early October 1997, just before his confrontation interview on October 7.

Defendants' demonstration that the Honor Committee followed the relevant By–Laws in appointing Cobb's honor advisor is sufficient to resolve the Due Process claim, but plaintiff presents several arguments for proceeding to trial anyway. First, he argues that his dismissal was for academic reasons rather than disciplinary reasons since his justification for his exam answers was not using the correct academic formulas. However, plaintiff's interpretation of his expulsion as being academic is a non-starter: plaintiff was expelled for cheating, a violation of

made them similarly-situated, plaintiff has not met his burden.

the University's Honor Code, which is undisputably a disciplinary matter. *See generally Henson v. Honor Comm. of Univ. of Va.,* 719 F.2d 69 (4th Cir.1983). And, as an aside, arguing that the expulsion is an academic matter actually harms plaintiff's case since due process does not require *any* type of formal hearing in the context of academic dismissals. *See Board of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

Alternatively, plaintiff argues that—regardless of the language and procedures of the by-laws—his due process rights were violated because the seven-month delay in assigning him an honor advisor caused him to lose track of the other students in the economics class (therefore causing him to be unable to try to recreate the seating arrangement in the classroom on the day of the examination and determine the exact version of the test which the students around him had), prevented him from recording the mental processes he used to answer the questions on the exam, and prevented him from taking legal action to preserve all of the other students' test papers and the Honor Committee files before they could be destroyed. Plaintiff also argues that the seven-month delay in appointing an honor advisor caused him to believe, to his prejudice, that the Honor Committee had dropped its case against him.

 This Court has already visited these arguments at the motion to dismiss stage, albeit in a slightly different form. In the context of student discipline, the due process clause requires "notice and an opportunity to be heard." *See Dixon v. Alabama State Bd. of Educ.,* 294 F.2d 150 (5th Cir.1961); *Gorman v. University of Rhode Island,* 837 F.2d 7, 12 (1st Cir. 1988); *Carey v. Maine Sch. Admin. Dist. No. 17,* 754 F.Supp. 906, 918 (D.Me.1990); *Reilly v. Daly,* 666 N.E.2d 439, 444 (Ind. Ct.App.1996). " 'Due process is flexible and calls for such procedural protections as the particular situation demands.' " *Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), *quoting Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The Due Process Clause requires a hearing "at a meaningful time." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546–47, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (noting that a 9–month adjudication is not unconstitutionally lengthy *per se* ). This Court's memorandum opinion noted that the nine-month delay from the time of the exam to the honor trial did not create a viable due process claim. *See Cobb,* 69 F.Supp.2d at 829–30; *see also United States v. Scott,* 795 F.2d 1245, 1249 (5th Cir.1986) ("[a]ctual prejudice cannot be proven through generalized claims of memory loss or by a claim that delay necessarily causes prejudice"); *United States v. Lynch,* 56 F.3d 62, 1995 WL 325670 (4th Cir.1995) (unpublished) (quoting *Scott* with approval). Now, plaintiff makes the same delay-based argument, but attempts to hitch it to the fact that he was not provided with an honor advisor until the following fall (instead of arguing that the actual trial did not occur until the following fall). However, and for fundamentally the same reasons as enunciated in the memorandum opinion, plaintiff's argument fails.

Plaintiff knew (or should have known) that he was facing honor charges. The fact that he was advisor-less for seven months would not have prevented him from remembering where other students sat in the class or from remembering the thought processes he used to answer exam questions. As it is, this Court has already held that, "since the length of time between Cobb's exam and the trial did not violate a time prescribed by the Honor System, the plaintiff's due process theory of detrimental reliance is dismissed as to the time of the trial." *Cobb,* 69 F.Supp.2d at 829. Similarly, the delay in providing an honor advisor, while significant, did not violate the relevant By–Laws. And, if anything, plaintiff's delay argument is even less palpable when applied to the timely provision of an honor advisor, who is mere-

ly supposed to provide emotional support and general information about the honor process to a charged student, not assist in the preparation of a defense. As this Court has noted, "[w]hile having an honor advisor assigned to a student during the pre-trial process may be beneficial, the due process clause does not require such assistance." *Id.*

As for the destruction of evidence, other students' test papers were not "destroyed" but instead were returned to test-takers pursuant to normal classroom practice. Likewise, plaintiff has presented no evidence that Honor Committee files pertaining to Cobb's or other cases were intentionally destroyed in anticipation of litigation or his honor trial during the intervening seven-month period. Plaintiff knew almost immediately after the exam that honor charges had been brought against him. Defendant has presented unrebutted evidence that no one contacted Cobb to inform him officially or unofficially that the case had been dropped. Plaintiff received an "Incomplete" in Economics 371 when his grades arrived over the summer, and he was told by Mitchener that he would receive that grade notation because of the pending honor charges. Finally, an affadavit from Cobb's honor advisor indicated that he was "expecting her call" when she contacted him in the fall. Accordingly, no due process violation occurred and summary judgment must be granted in favor of the defendants.

### 4. The Defamation Claim

Plaintiff's final cause of action is a defamation claim based on a statement in a letter sent by Harmon to him on December 16, 1997. The statement reads:

> Formal notification has been received from the Honor Committee which indicates that you voluntarily terminated your enrollment in the University hereby admitting guilt to an honor violation.

The statement is inaccurate, since plaintiff never admitted his guilt. However, plaintiff's claim fails because he cannot establish a common-law action of defamation.

The elements of defamation under Virginia law are (1) publication (2) of an actionable statement (3) with the requisite intent. *Ramey v. Kingsport Pub. Corp.*, 905 F.Supp. 355, 358 (W.D.Va.1995), *citing Chapin v. Greve*, 787 F.Supp. 557, 562 (E.D.Va.1992). Under Virginia law, there is no publication when a defamatory communication occurs between persons within a corporate entity who have a duty and interest in the subject matter. *Chalkley v. Atlantic Coast Line R. Co.*, 150 Va. 301, 143 S.E. 631, 638–40 (1928); *Montgomery Ward & Co. v. Nance*, 165 Va. 363, 182 S.E. 264, 269 (1935). No publication occurs when the communication, which regards a matter of corporate interest, remains entirely within a corporate entity. *Childress v. Clement*, 44 Va. Cir. 169, 175 (Richmond Cir. Ct.1997). Harmon's letter to Cobb was also copied to three members of the University community: Dean of Students Robert T. Canevari, Associate Dean for Academic Programs Stephen Plog, and April Fearnley, the Honor Committee's Vice Chair for Trials. Each of these three individuals had a "duty and interest" in honor proceedings, and plaintiff has definitively identified no one else as having received the letter. Evidence demonstrates that Harmon, Canevari, Plog, and Fearnley each maintained the letter's confidentiality and took careful measures to assure that it was not seen by strangers uninterested in the matter. Accordingly, Harmon's letter does not constitute a "publication" for the tort of defamation. *See also id.* at 174–75 (dissemination of letter within university community was not published for purposes of defamation action).

Defendants also argue that Harmon's letter was privileged (either absolute or qualified privilege) and that plaintiff's claim is barred by the doctrine of sovereign immunity. However, since plaintiff cannot make out a case of defamation, this Court will not reach defendants' other defenses.

## CONCLUSION

Because Darryl and Annette Cobb lack standing, their independent claims shall be dismissed. Moreover, because there is no dispute as to genuine issues of material fact, defendants' motion for summary judgment shall be granted.

## ORDER

Defendants' filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to all remaining claims in this case. Defendants have also moved to dismiss any claims made by Darryl and Annette Cobb, parents of Jonathan Cobb, for lack of standing.

For the reasons set forth in the attached Memorandum Opinion, it is hereby ORDERED that any and all claims of Darryl Cobb and Annette Cobb be dismissed for lack of standing. It is also ORDERED that defendants' motion for summary judgment be granted on all remaining claims in this case.

The clerk is directed to send a certified copy of this Order and attached Memorandum Opinion to all counsel of record and to strike the case from the docket.